NORA J. CHOROVER (Bar No. 547352)
Stern, Shapiro, Weissberg & Garin, LLP
90 Canal Street, 5th Fl.
Boston, MA  02114
Phone:     617-742-5800
Fax:        617-742-5858

Attorneys for Plaintiff
CLEAN WATER ACTION

UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF MASSACHUSETTS

| | |
|---|---|
| CLEAN WATER ACTION,<br><br>　　　　　　Plaintiff,<br><br>　v.<br><br>GINMAR ENTERPRISES, INC.,<br><br>　　　　　　Defendant. | Case No.  1:09-11885-MAP<br><br>**AMENDED COMPLAINT FOR DECLARATORY AND INJUNCTIVE RELIEF AND CIVIL PENALTIES**<br><br>(Federal Water Pollution Control Act, 33 U.S.C. §§ 1251 to 1387) |

CLEAN WATER ACTION ("CWA") by and through its counsel, hereby alleges:

### INTRODUCTION

1. This is a civil suit brought under the citizen suit enforcement provisions of the Federal Water Pollution Control Act, 33 U.S.C. § 1251, et seq. (the "Clean Water Act" or "the Act"). Plaintiff seeks declaratory judgment, injunctive relief, and other relief the Court deems appropriate with regard to actions taken by Ginmar Enterprises, Inc. ("Ginmar") which resulted in the discharge of stormwater runoff from the Ginmar site into waters of the United States, in violation of the Act.

2. Activities that take place at industrial facilities, such as material handling and storage, are often exposed to the weather.  As runoff from rain or snow melt comes into contact with these materials, it picks up pollutants and transports them to nearby storm sewer systems, rivers, lakes, or

coastal waters. Stormwater pollution is a significant source of water quality problems for the nation's waters.

## JURISDICTION AND VENUE

3. This Court has subject matter jurisdiction over the parties and the subject matter of this action pursuant to Section 505(a)(1)(A) of the Act, 33 U.S.C. § 1365(a)(1)(A), and 28 U.S.C. § 1331 (an action arising under the laws of the United States).

4. On August 21, 2009, plaintiff provided notice of defendant's violations of the Act, and of its intention to file suit against defendant, to the Administrator of the United States Environmental Protection Agency ("EPA"); the Acting Administrator of EPA Region I; the Commissioner of the Massachusetts Department of Environmental Protection ("DEP"); and to defendant, as required by the Act, 33 U.S.C. § 1365(b)(1)(A). A true and correct copy of CWA's notice letter is attached as Exhibit A, and is incorporated by reference.

5. More than sixty days have passed since notice was served on defendant and the state and federal agencies. Plaintiff is informed and believes, and thereupon alleges, that neither the EPA nor the Commonwealth of Massachusetts has commenced or is diligently prosecuting a court action to redress the violations alleged in this complaint. This action is not barred by any prior administrative penalty under Section 309(g) of the Act, 33 U.S.C. § 1319(g).

6. Venue is proper in the District Court of Massachusetts pursuant to Section 505(c)(1) of the Act, 33 U.S.C. § 1365(c)(1), because the source of the violations is located within this judicial district. Pursuant to Local Rule 40.1(D)(1)(b), this case is properly assigned to the Eastern Division, because both parties are located in Massachusetts, and plaintiff is located within the Eastern Division.

## PARTIES

7. Plaintiff CLEAN WATER ACTION ("CWA") is a nationwide non-profit public benefit corporation organized under the laws of the District of Columbia, with its main New England office located in Boston, Massachusetts. CWA has approximately 50,000 members who live, recreate and work in and around waters of the Commonwealth of Massachusetts, including in Ludlow, and in the vicinity of Higher Brook and the Chicopee River. CWA is dedicated to working for clean, safe

and affordable water, the prevention of health-threatening pollution, the creation of of environmentally-safe jobs and businesses, and the empowerment of people to make democracy work. To further these goals, CWA actively seeks federal and state agency implementation of the Act and other laws and, where necessary, directly initiates enforcement actions on behalf of itself and its members.

8. Members of CWA reside in the Ludlow area. They use and enjoy Higher Brook and the Chicopee river for recreation, sightseeing, wildlife observation and/or other activities in the vicinity of and downstream of defendant's discharges. Members of CWA use and enjoy the waters into which defendant has caused, is causing, and will continue to cause, pollutants to be discharged. Members of CWA have a recreational, aesthetic and/or environmental interest in Higher Brook and the Chicopee River. The interests of CWA's members have been, are being, and will continue to be adversely affected by defendant's failure to comply with the Clean Water Act. The relief sought herein will redress the harms to plaintiff caused by defendant's activities.

9. Continuing commission of the acts and omissions alleged above will irreparably harm plaintiff and the citizens of the Commonwealth of Massachusetts, for which harm they have no plain, speedy, or adequate remedy at law.

10. Defendant GINMAR ENTERPRISES, INC. is a corporation organized under the laws of the Commonwealth of Massachusetts that operates a sand and gravel facility in Ludlow.

## STATUTORY BACKGROUND

11. <u>Pollutant Discharges without a Permit are Illegal</u>. The Clean Water Act makes the discharge of pollution into waters of the United States unlawful unless the discharge is in compliance with certain statutory requirements, including the requirement that the discharge be permitted by the federal Environmental Protection Agency ("EPA") under the National Pollutant Discharge Elimination System ("NPDES"). Sections 301(a), 402(a) and 402(p) of the Act. 33 U.S.C. §§ 1311(a), 1342(a), 1342(p).

12. <u>EPA Has Made Stormwater Discharges from Sand and Gravel Facilities Subject to the Requirements of EPA's General Industrial Stormwater Permit</u>. In order to minimize polluted stormwater discharges from industrial facilities, the federal Environmental Protection Agency has

issued a general industrial stormwater permit ("Stormwater Permit"). EPA's Stormwater Permit was first issued in 1995, and was reissued in 2000 and 2008. See 60 Fed. Reg. 50804 (Sept. 29, 1995); 65 Fed. Reg. 64746 (Oct. 30, 2000); 73 Fed. Reg. 56572 (Sept. 29, 2008). Sand and gravel facilities are subject to the requirements of this Stormwater Permit. See Stormwater Permit, Appendix D, pg. D-4. Sand and Gravel facilities may also apply for coverage under an individual permit. 40 CFR 122.26(c).

13.  Sand and Gravel Facilities Must Develop and Implement a Stormwater Pollution Prevention Plan (SWPPP). An owner or operator (hereafter referred to as "operator") of a facility subject to the requirements of the Stormwater Permit must prepare a SWPPP before applying to EPA for coverage under the Stormwater Permit. The SWPPP must be "prepared in accordance with good engineering practices," Stormwater Permit, pg. 17 (referring to "control measures"), and, among other things,

* identify potential sources of pollution at the facility;
* describe and ensure implementation of control measures that are technologically available and economically practicable and achievable in light of best industry practice;
* set forth specific procedures to assure compliance with effluent limitations and monitoring/inspection requirements of the Stormwater Permit.

See 40 CFR 122.26(c)(i); Stormwater Permit pgs. 12, 27-30.

14.  Sand and Gravel Facilities Must Submit to EPA a Notice of Intent to Be Covered by the Stormwater Permit By EPA's Established Deadlines. After completing and implementing its SWPPP, sand and gravel facilities must submit to EPA a Notice of Intent to be covered by the Stormwater Permit. EPA's initial NOI filing deadline was January 1, 1996. See 60 Fed. Reg. 50804. When the agency reissued the Stormwater Permit in 2008, it reminded operators of subject facilities that unpermitted stormwater discharges are "unauthorized," and ordered all subject facilities to file an NOI for the 2008 permit by January 5, 2009. See Stormwater Permit, pg. 9 (unpermitted discharges from the facility will continue to be "unauthorized" unless allowed under

the Stormwater Permit). See also 40 C.F.R. §122.28(b)(2)(i) ("A discharger ... who fails to submit a notice of intent in accordance with the terms of the permit is not authorized to discharge ....").

15. <u>Sand and Gravel Facilities Must Comply with the Terms of the Stormwater Permit</u>. The Stormwater Permit requires sand and gravel facilities to, among other things:

    a.    ensure that stormwater discharges meet applicable water quality standards, *see* Stormwater Permit, pg. 16;

    b.    Reduce and/or eliminate pollutants to the extent achievable using control measures (including best management practices) that are technologically available and economically practicable and achievable in light of best industry practice, *see* Stormwater Permit, pg. 12;

    c.    implement specific best management practices set forth in the Stormwater Permit for sand and gravel facilities, *see* Stormwater Permit, pgs. 79-86;

    d.    monitor stormwater discharges for compliance with benchmark limitations applicable specifically to sand and gravel facilities, *see* Stormwater Permit, pg. 84;

    e.    report monitoring results to EPA by specified deadlines, *see* Stormwater Permit, pgs. 41-43;

    f.    comply with any additional state requirements, *see* Stormwater Permit, pgs. 140-141.

16. <u>Citizens may bring action to enforce these requirements</u>. Section 505(a)(1) and Section 505(f) of the Act provide for citizen enforcement actions against any "person," including individuals, corporations, or partnerships, for violations of NPDES permit requirements and for unpermitted discharges of pollutants. 33 U.S.C. §§1365(a)(1) and (f), § 1362(5). An action for injunctive relief under the Act is authorized by 33 U.S.C. § 1365(a). Violators of the Act are also subject to an assessment of civil penalties of up to $32,500 a day for each violation on before January 12, 2009, *see* 33 U.S.C. § 1319(d), 69 Fed. Reg. 7121 (Feb. 13, 2004), and $37,500 per day of violation for violations after that date. *See* 73 Fed. Reg. 75340 (Dec. 11, 2008).

## STATEMENT OF FACTS

17. Defendant operates a sand and gravel facility at 136 Carmelinas Circle, Ludlow, MA (the "Site" or "Facility") and may also engage in other activities that require a Stormwater Permit. The Site covers approximately 12.8 acres, and includes a yard, office, scale, and operations buildings and equipment. Its operations include sand and gravel mining and processing.

18. Polluted stormwater from the Facility is conveyed offsite from a location referred to by defendant as "Outfall 001." Outfall 001 discharges to a pond immediately adjacent to the Site. The pond is tributary to Higher Brook.

19. Outfall 001 conveys polluted stormwater from several locations at the Facility.

20. Runoff from the southern side of the Facility discharges to Outfall 001 when flow exceeds the capacity of a small settling pond near the scale house.

21. Some runoff from northern portions of the facility enter a man-made swale on that runs along the eastern side of the Facility.

22. Even when it is not raining, the swale relatively constantly fills with groundwater, which forms a stream running towards the south. The stream travels through a culvert and under a road before it empties into a pond on the western side of the Facility.

23. Ginmar has placed an automatic sampler at a location in this small creek after the creek leaves the facility and before it enters the pond. The automatic sampler for stormwater is located above the level at which the stream flows when it is not raining.

24. On information and belief, plaintiff alleges that defendant refers to the location of the automatic sampler as "Outfall 001."

25. The southernmost portion of the swale contains large amounts of sediments.

26. The area of the stream around Outfall 001 contains large amounts of sediments.

27. During rain or snowmelt, runoff from the site enters Outfall 001 from locations on the site other than the swale, including areas on the north and west portions of the site.

28. Stormwater runoff from the Outfall 001 has been found to exceed EPA benchmark values for Total Suspended Solids and Nitrate plus Nitrogen.

29.     Numerous activities at the site take place outside and are exposed to rainfall.  These activities include blasting, sorting, crushing, washing, raw material storage, waste rock storage, loading and unloading.

30.     Industrial machinery and heavy equipment, including trucks and fork lifts, are operated, maintained, or stored at the Site in areas exposed to storm water flows.  Plaintiff is informed and believes, and thereupon alleges, that such machinery and equipment leak contaminants such as oil, grease, diesel fuel, anti-freeze and hydraulic fluids which are exposed to storm water flows.

31.     The management practices at the Site are wholly inadequate to prevent the sources of contamination described above from causing the discharge of pollutants to waters of the United States.  The Site lacks sufficient structural controls such as settling basins, grading, berming or roofing to prevent rainfall and storm water flows from coming into contact with these and other sources of contaminants.  The Site lacks sufficient structural controls to prevent the discharge of water once contaminated.  The Site lacks an adequate system, such as a filtration system, to treat water once contaminated.

## CLAIMS FOR RELIEF

### FIRST CAUSE OF ACTION:
### Failure to Obtain and Comply with a Permit for Industrial Discharges

32.     Plaintiff re-alleges and incorporates Paragraphs 1-31, inclusive, as if fully set forth herein.

33.     Between at least November 1, 2004 and January 8, 2010, defendant discharged polluted storm water from the Facility into a pond to the west of the Facility that is tributary to Higher Brook, in violation of the Clean Water Act.  Sections 301(a), 402(a) and 402(p) of the Act, 33 U.S.C. §§ 1311(a), 1342(a), 1342(p).

34.     During every rain event, rainwater flowing over exposed materials at the Facility becomes contaminated with pollutants. The rainwater then flows untreated from the Facility into the pond to the West of the Facility and into Higher Brook.

35.     The days between November 1, 2004 and January 7, 2010 on which rain, snow melt or other factors caused stormwater to be discharged from the site to US waters are listed on Exhibit B hereto.

36. Every day between November 1, 2004 and January 8, 2010 that defendant discharged polluted storm water from the Facility without a stormwater permit is a separate and distinct violation of Section 301(a) of the Act, 33 U.S.C. § 1311(a). These violations are ongoing and continuous.

**SECOND CAUSE OF ACTION:**
**Failure to Prepare and Implement an Adequate**
**Stormwater Pollution Prevention Plan**

37. Plaintiff re-alleges and incorporates Paragraphs 1-36, inclusive, as if fully set forth herein.

**Inadequate Site Map**

38. Section 5.1.2 of the Stormwater Permit requires the Stormwater Pollution Prevention Plan to include a "site map" that shows, among other things,

> the location and extent of significant structures and impervious surfaces;
>
> directions of stormwater flow;
>
> locations of all existing structural control measures;
>
> locations of all stormwater conveyances;
>
> locations of stormwater monitoring points; and
>
> locations of stormwater inlets and outfalls.

39. The Site Map in defendant's SWPPP is inadequate because it does not accurately show the location and extent of significant structures and impervious surfaces.

40. The Site Map is inadequate because it does not accurately show the directions of stormwater flow.

41. The Site Map is inadequate because it does not accurately show the location of all existing structural control measures.

39. The Site map is inadequate because it does not accurately show the locations of stormwater monitoring points.

39. The Site map is inadequate because it does not accurately show the locations of stormwater inlets and outfalls.

**Inadequate Listing of Pollutant Sources**

42.     Section 5.1.3.2 of the Stormwater Permit requires the SWPPP to include a list of pollutants or pollutant constituents associated with each identified activity at the Site. The pollutant list must include all significant materials that have been handled, treated, stored or disposed, and that have been exposed to stormwater in the 3 years prior to the date defendant prepared or amended its SWPPP.

43.     Defendant's pollutant list does not include Nitrate plus Nitrite Nitrogen, a pollutant that is present in its stormwater discharge in levels exceeding EPA's benchmark values, and does not identify any activity with which this pollutant is associated.

44.     Each and every day since at least November 1, 2004 on which defendant has failed to have an adequate Stormwater Pollution Prevention Plan is a separate and distinct violation of Section 301(a) of the Act, 33 U.S.C. §1311(a), and Section 402 of the Act, 33 U.S.C. § 1342.

**THIRD CAUSE OF ACTION:**
**Failure to Take Corrective Action and Modify SWPPP**
**To Address Exceedences of EPA's TSS and Nitrate plus Nitrogen Benchmarks**

45.     Plaintiff re-alleges and incorporates Paragraphs 1-44, inclusive, as if fully set forth herein.

46.     Section 5.2 of the Stormwater Permit requires defendant to "modify [its] SWPPP whenever necessary to address any of the triggering conditions for corrective action in Part 3.1 and to ensure that they do not reoccur." The SWPPP modifications must be made in accordance with the corrective action deadlines in Parts 3.3 and 3.4 of the Stormwater Permit.

47.     A triggering condition for corrective action at the Site occurred on March 15, 2010. This triggering condition was a sampling result of 3.10 mg/l for Nitrates plus Nitrogen for stormwater discharged at Outfall 001. This result was more than 4 times the EPA 4-quarter benchmark level of 0.68 mg/L.

48.     A triggering condition for corrective action at the Site occurred on June 18, 2010. This triggering condition was a sampling result of 690 mg/l for Total Suspended Solids in stormwater discharged at Outfall 001. This result was more than 4 times the EPA 4-quarter benchmark level of 100 mg/l.

49.     Defendant did not take corrective action or modify its SWPPP following these triggering conditions by the deadlines in Section 3.3 of the Stormwater Permit.

50.     Each and every day since at least April 15, 2010 on which defendant has failed and continues to fail to take corrective action and modify its SWPPP to describe corrective action(s) regarding discharges of Nitrates plus Nitrogen at levels in excess of EPA benchmarks is a separate and distinct violation of Section 301(a) of the Act, 33 U.S.C. §1311(a), and Section 402 of the Act, 33 U.S.C. § 1342.

51.     Each and every day since at least July 18, 2010 on which defendant has failed and continues to fail to take corrective action and modify its SWPPP to describe corrective action(s) regarding discharges of Total Suspended Solids at levels in excess of EPA benchmarks is a separate and distinct violation of Section 301(a) of the Act, 33 U.S.C. §1311(a), and Section 402 of the Act, 33 U.S.C. § 1342.

**FOURTH CAUSE OF ACTION:**
**Inadequate Recordkeeping and Reporting**

52.     Plaintiff re-alleges and incorporates Paragraphs 1-51, inclusive, as if fully set forth herein.

53.     Section 6.1.3 of the Stormwater Permit states that for each monitoring event defendant must, among other things, "identify the date and duration (in hours) of the rainfall event, rainfall total (in inches) for that rainfall event, and time (in days) since the previous measurable storm event."

54.     Section 6.0 of the Stormwater Permit, which incorporates by reference Appendix B, Subsections 10-12 of the permit, requires sampling reports to contain, among other things,

   *the date and time of the sampling event

   *the exact location where samples are taken

   *the method used to collect the samples

   *specific information on the storm event and flow rate

   *specific information on the laboratory that did analysis

55. On information and belief, plaintiff alleges that defendant failed to comply with these recordkeeping and reporting requirements and submitted only summary information to EPA concerning its stormwater discharges from Outfall 001.

56. Each and every day since at least March 30, 2010 on which defendant has failed and continues to fail to comply with these recordkeeping and reporting requirements is a separate and distinct violation of Section 301(a) of the Act, 33 U.S.C. §1311(a), and Section 402 of the Act, 33 U.S.C. § 1342.

## FIFTH CAUSE OF ACTION:
### Inadequate Monitoring of Stormwater Runoff

57. Plaintiff re-alleges and incorporates Paragraphs 1-56, inclusive, as if fully set forth herein.

58. Appendix B, section 10(A) of the Stormwater Permit requires that samples and measurements taken for the purpose of monitoring must be "representative of the volume and nature of the monitored activity."

59. Section 6.1.4 of the Stormwater Permit requires defendant to collect its stormwater sample within the first 30 minutes of a measurable storm event, unless defendant documents that it is impossible to do so.

60. Defendant's method of monitoring at the top of the water column underestimates the presence of Total Suspended Solids in its stormwater discharge and is thus not representative of the volume and nature of Total Suspended Solids in defendant's stormwater discharges.

61. On information and belief, plaintiff alleges that defendant's method of monitoring stormwater discharge at Outfall 001 does not allow it to monitor "within the first 30 minutes of a measurable storm event" as required by the permit.

62. Each and every day since at least March 15, 2010 on which defendant has failed and continues to fail to comply with these monitoring requirements is a separate and distinct violation of Section 301(a) of the Act, 33 U.S.C. §1311(a), and Section 402 of the Act, 33 U.S.C. § 1342.

## RELIEF REQUESTED

Wherefore, Plaintiff respectfully requests that this Court grant the following relief:

1. Declare defendant to have violated and to be in violation of the Act as alleged herein;

2. Enjoin defendant from discharging pollutants from the Facility and to the surface waters surrounding and downstream from the Facility;

3. Require defendant to implement the requirements of the Stormwater Permit;

4. Order Defendant to pay civil penalties of up to $32,500 a day for each violation on before January 12, 2009, and up to $37,500 per day of violation for violations after that date;

5. Order Defendant to take appropriate actions to restore the quality of navigable waters impaired by their activities;

6. Award Plaintiff's costs (including reasonable investigative, attorney, witness, and consultant fees) as authorized by the Act, 33 U.S.C. § 1365(d); and

7. Award any such other and further relief as this Court may deem appropriate.

Dated: January 24, 2011  Respectfully submitted,

*/s/ Nora J. Chorover*
NORA J. CHOROVER (Bar No. 547352)
Stern, Shapiro, Weissberg & Garin, LLP
90 Canal Street, 5th Fl.
Boston, MA  02114
Phone: 617-742-5800
Fax:    617-742-5858

Attorneys for Plaintiff
CLEAN WATER ACTION

### CERTIFICATE OF SERVICE

I hereby certify that on January 24, 2011 I caused a copy of the foregoing pleading to be filed with the Court's ECF filing system, which will cause an electronic notice to be sent to counsel of record.

*/s/ Nora J. Chorover*
Nora J. Chorover